LAS MONJAS RACING CORPORATION, Petitioner, v. DISTRICT COURT OF SAN JUAN, HONORABLE T. TORRES PÉREZ, ACTING JUDGE, Defendant.

No. 1164. Argued February 6, 1939.—Decided March 7, 1939.

*L. Feliú, Celestino Iriarte* and *F. Fernández Cuyar* for petitioner. *Dubón & Ochoteco* for intervenor J. Pedrosa, defendant in the main suit. *Diego O. Marrero* for the Comisión Hípica.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

In an action brought against six defendants, Las Monjas Racing Corporation sought to recover $65,000 as damages —with costs, expenses, disbursements and attorney's fees. In the prayer for relief, the joint and several liability of two of these defendants, Juan Pedrosa and Jorge Romaní— aside from the question of costs, expenses, disbursements and attorney's fees—was limited to $30,000.

Plaintiff moved for an attachment of property to the amount of $5,000 only in order to secure *pro tanto* the effectiveness of any judgment that might be obtained in the action for $65,000; and offered to furnish a bond in an amount to be fixed by the court. The district court ordered the clerk to issue a writ of attachment as prayed for upon the furnishing of a bond in the sum of $5,000.

Defendant Juan Pedrosa, the owner of twelve horses which had been attached, presented a bond and moved that the horses be placed in his custody. The bond was for $5,000 said to have been fixed by the court as the value of the attached property. Pedrosa, in his motion, invoked the provisions of section 15 of the Law to Secure the Effectiveness of Judgments; but the bond for the value of the attached property was conditioned upon the failure of Pedrosa to return the said property, with any profits derived therefrom, when required in accordance with the provisions of sections 10 and 11 of the Law. One of the attorneys for plaintiff endorsed upon this bond his conformity with the proposed deposit, under the warnings and responsibilities prescribed by law, provided that plaintiff were given five days from the date of delivery of the attached property to defendant Pedrosa within which to examine the sufficiency of the bond and the solvency of the sureties.

Thereupon the district court approved the bond as furnished to secure the value of the attached property, ordered delivery of the latter to Pedrosa, and granted plaintiff five days within which to question the sufficiency of the bond.

This order was dated January 4, 1939. The marshal, after delivery of the horses to Pedrosa, specified in his return the value of each horse. These estimated values ranged from $200 to $700 and amounted in the aggregate to $5,000.

Pedrosa then moved, under section 15, to discharge the attachment upon furnishing another bond for $5,000. Notice of this motion was served upon counsel for plaintiff, and January 9 was fixed as the day for a hearing. On plaintiff's motion, the court ordered the sureties on the previous under-taking to appear January 9 and justify. By a supplementary order of January 6, the court made it clear that, pending action on Pedrosa's motion to discharge the attachment, the horses were in *custodia legis* and could not be disposed of in any manner contrary to law or be entered or permitted to run on any insular race track without previous judicial authorization; and provided for the service of notice to that effect on Pedrosa and on the Insular Racing Commission. By an order of January 7, the court authorized the running of the horses on the insular race tracks. This order was made in the presence of counsel after a hearing and after the filing of another bond for $5,000, under sections 10 and 11 of the law. The bond was conditioned upon the failure of Pedrosa to return the attached property with the profits derived therefrom when required. It contained a further provision as to any damages to the horses that might be caused by the running of the same on any race track in Puerto Rico or in case they or any of them should be "claimed" by reason of their participation in any race. By an order of January 9, the court explained that its order of January 7 included "claiming races" and that the bond included an obligation to pay the value of any horse the possession of which might be lost as the result of participation in any "claiming race".

On January 17, the court ruled that the bond should be for $5,000 to secure Pedrosa's possession and legal custody of the attached property which would remain subject to the

attachment pending a final determination of the controversy; but that, in order to obtain a discharge of the attachment under section 15 of the law, a bond for the amount claimed by plaintiff—that is to say, for $30,000 plus a reasonable amount to cover costs, disbursements, and attorney's fees— would be required. On January 18, the court overruled a motion for reconsideration; and granted Pedrosa twenty-four hours within which to file his bond in accordance with the court's ruling of the previous day.

Plaintiff then moved to set aside the orders of January 4 and January 7. In an order dated January 26, the court reviewed and discussed at some length its previous orders and, without any very specific ruling, denied plaintiff's motion by implication. The theory of that motion was: that the first bond was based upon the valuation of the attached property by the marshal and by the original custodian, but not upon the actual value as required by section 10 of the Act to Secure the Effectiveness of Judgments; that the said bond did not include any security for the profits to be derived from the said property, in accordance with the provisions of section 11 of the law and of the Civil Code, nor for costs; that plaintiff did not receive any notice of defendant's motion for reconsideration of the order of January 17.

Petitioner seeks a review and a reversal of the orders dated January 4, January 7, January 17 and January 26.

Sections 9 and 10 of an Act to Secure the Effectiveness of Judgments, approved March 1, 1902 (Code of Civil Procedure, 1933 ed. 97) read as follows:

"Section 9.—The attachment and order prohibiting the alienation or (sic) real property shall be recorded in the registry of property, the court notifying the defendant thereof and warning him that he cannot alienate the property attached except at public auction and after notice shall have been given to the plaintiff to be present at the sale, the proceeds of such sale to be deposited subject to the order of the court; nor can the defendant alienate, in any case, the property on which a prohibition has been decreed. The alienation of any property in contravention of the provisions of this section, shall

be deemed fraudulent for all civil and penal purposes, and the persons guilty of such offense shall also be punished for contempt of court.

"Section 10.—An order prohibiting the alienation of personal property, and an attachment on the same, shall be effected by depositing the personal property in question with the court, or the person designated by it, under the responsibility of the plaintiff. If the defendant give sufficient bond, in the discretion of the court to cover the value of the said property, the latter shall be deposited with him, under the warning and responsibilities of the preceding section. The owner of personal property under attachment may demand its sale at public auction, after notification to the plaintiff, upon condition that the proceeds of the sale be deposited with the court. Perishable property under attachment, or on which an order prohibiting its sale has been issued, shall be sold at public auction, upon petition of either of the parties, depositing the proceeds thereof as the court may direct."

Any horse entered in a "claiming race", it seems, may become the property of any person other than the owner of such horse who has entered another horse in the same race, upon deposit by the "claimant" of a specified sum of money at any time before the start. The order of January 7, as far as it authorizes the running of the horses in "claiming races", was in the teeth of sections 9 and 10 of the Act to Secure the Effectiveness of Judgments, and cannot be sustained.

Section 15 of the Act provides that:

"Section 15.—The payment or deposit by the defendant of the sums claimed from him, or a bond given by him to cover the claim, shall suspend the attachment ordered to secure said claim, or shall annul an attachment already in force."

The bond here contemplated is a discharge or dissolution bond. The bond contemplated by section 10 is a forthcoming or delivery bond, not a dissolution bond. The second bond filed by Pedrosa was, like the first, a forthcoming or delivery bond, not a dissolution bond. The fact that he sought, by the filing of such a bond, to obtain a dissolution of the attachment did not alter the operation and effect of the bond tend-

ered by him and approved by the court. The error, if any, in the ruling of January 17—to the effect that Pedrosa could not effect a dissolution of the attachment by the filing of a bond for $5,000, but in order to accomplish that result would be required to furnish a bond for $30,000 plus a reasonable amount to secure costs, disbursements and attorney's fees— was not prejudicial to petitioner. That ruling, whether right or wrong, was substantially in accord with petitioner's own theory as to the purpose and meaning of section 15.

By the terms of section 14 of the Law:

"All allegations made by either party in the course of the proceedings regarding the remedy, shall be substantiated, notifying the other party by means of a summons to appear before any of the judges, each party having then an opportunity to produce their proofs . . ."

When petitioner, by its attorney, endorsed upon the first bond tendered by Pedrosa its conformity with the proposed deposit of the attached property under the warnings and responsibilities prescribed by law, it waived the notice and hearing required by section 14. The "warnings and responsibilities" referred to, were presumably the "warnings and responsibilities" indicated in Sections 9 and 10, *supra*. Petitioner was notified of all subsequent motions except the motion presented by Pedrosa for reconsideration of the order of January 17, and overruled by the court January 18. If this motion was one of the "allegations" referred to in section 14, any error involved in the immediate overruling of the motion by the court without notice to petitioner was harmless.

The endorsement, fairly construed, also amounted to a waiver of any formal preliminary proof which otherwise might or might not have been required as to the actual value of the attached property, notwithstanding petitioner's reservation of its right to "examine the sufficiency of the bond and the solvency of the sureties" within five days after delivery of the attached property to the defendant, Pedrosa. Petitioner's subsequent motion to vacate the order of January

4, did not question the sufficiency of the bond as to the amount thereof with reference to the actual value of the property.

It challenged only the solvency of the sureties and demanded that they be required to justify. January 9 was fixed as the day for a hearing of this motion and of Pedrosa's motion to dissolve the attachment upon the filing of another bond for $5,000. There is nothing to show that at his hearing petitioner insisted upon its motion to set aside the order of January 4, or even called the attention of the court to the fact that the motion had been set for a hearing simultaneously with Pedrosa's motion. The inference is that petitioner's motion was, temporarily at least, abandoned. Petitioner apparently did not thereafter at any time request that the sureties on the original bond be again required to justify, or that another day should be fixed for a hearing of its motion.

We have mentioned the fact that petitioner, in its subsequent motion to set aside the orders of January 4 and January 7, stated that the first bond for $5,000 was based upon the valuation of the attached property by the marshal and by the original custodian, not upon the actual value thereof; and that the bond did not include any security for the profits to be derived from the said property. The bond, as we have shown, was for $5,000. It was conditioned upon Pedrosa's failure to return the attached property with the profits derived therefrom. Hence, the statement that the bond did not include any security for the profits to be derived, must be taken to mean that the obligation to pay $5,000 upon Pedrosa's failure to return the horses together with the profits derived therefrom did not afford any such security.

The original custodian was presumably, if not a person designated by plaintiff, at least the person designated by the court "under the responsibility of the plaintiff" as required by section 10, *supra*. The valuation placed upon the property by such custodian and by the marshal of the court, coupled with plaintiff's written consent endorsed upon the bond itself, was enough to justify a conclusion by the court

that the attached property was actually worth $5,000. The marshal, on delivery of the horses to Pedrosa, specified the value of each horse. The lowest of these estimates was $200; the highest $700. It is safe to assume that these estimates were based on the fact that the horses in question were race horses. Aside from the fact that the twelve horses were appraised in the aggregate at $5,000, that is to say, at an average of more than $400 each, the district judge had no reason to suppose that the original custodian and the marshal had underestimated the value of the horses, or were ignorant of their actual value, or had estimated their value without taking into consideration the fact that they were race horses, or without ascertaining the value of each horse as a race horse. If the earning capacity of these horses was taken into consideration in estimating their value, some part at least of the potential profits to be derived from the running of the horses was included in their estimated value. The order of January 4 did not, in terms at least, authorize the running of the horses. The supplementary order of January 6 expressly forbade the running of the horses without judicial authorization. Petitioner did not question the sufficiency of the bond, within the five days allowed for that purpose, on any ground going to the amount of the obligation assumed by Pedrosa and his sureties. It was not incumbent on the district judge—of his own initiative, in anticipation of such possible objection and notwithstanding plaintiff's written consent to a delivery of the horses—to demand a bond for more than $5,000, so as to include a sum over and above the estimated value of the horses sufficient to cover any profits derived from the running of the horses whether included or not in such estimated value. The defect, if any, in the bond as to the amount thereof did not vitiate the order of January 4, as explained or amended by the supplemental order of January 6.

Section 11 of the Act to Secure the Effectiveness of Judgments, reads as follows:

"Section 11.—The provisions of the preceding section are applicable to the crops (sic) yielded by the property under attachment or by the property the alienation of which has been prohibited if such attachment or prohibition include such crops (sic)."

The word "frutos" is used in the Spanish text where the word "crops" appears in the English version. No mention of "crops" or of "frutos" is made either in the motion for an order of attachment nor in the order of the court for the issuance of the writ of attachment. Neither the writ nor the marshal's return thereon is before us. There is nothing to show that the "attachment or prohibition" in the instant case included "crops" or "frutos". Unless future profits to be derived from the running of the horses can be deemed a part of the attached property or incident thereto, they cannot be held subject to the attachment lien. The decided cases thus far have dealt only with rents and profits, dividends on corporate stock, and interest on money, debts and saving accounts. See 7 C. J. S., Attachment, Section 258, *Increase or income from property,* and cases cited, especially *Loewe* v. *Savings Bank of Danbury,* 236 Fed. 444. A race horse does not produce profits automatically as a savings account draws interest or corporate stock earns dividends. A race horse cannot win races by being kept in a stall or in green pastures. Much depends upon the intelligence, skill and efficiency of experienced grooms, trainers and jockeys. More perhaps depends on the careful supervision, mental alertness and sound judgment of the owner. Inasmuch as both bonds provided for return of the horses and of the "fruits" produced by them, we need not speculate further along these lines.

In view of the foregoing conclusions, the questions involved in the various motions for a writ of supersedeas, for a restoration of the *status quo* and for the punishment of Pedrosa and of members of the Insular Racing Commission for alleged contempt, become largely, if not wholly, academic. They need not now be decided nor discussed.

396

The order of January 7 insofar as it authorizes the running of the attached horses in "claiming races" must be reversed. Beyond this, the result in the district court will not be disturbed. The record brought up by the two successive writs of certiorari will be returned to the district court.